Bell *agt.* Stainer.

---

---

BELL, appellant, *agt.* STAINER, respondent.

*Questions discussed.*

1. Whether the *bond and mortgage* given by the respondent, and which by his bill he sought to have cancelled, were procured by *fraud?*

2. Whether the respondent failed to make out the case of fraud alleged in his bill?

3. Where the fraud alleged in the bill was, that James H. Bell, at the time he agreed to sell the lots to the agent of the respondent, pretended to be the owner thereof; that he never had any legal or equitable title whatever to said premises, but so pretended to be the owner thereof to defraud the respondent; that he only had a contract of sale thereof from the owner, which contract was only in the nature of a conditional sale; and that he concealed the existence of said conditional sale to defraud the respondent,

Whether the evidence was sufficient to overcome the answer of James H. Bell, which being responsive to the bill, denied the allegations of fraud?

4. Whether respondent (the complainant) by any act of his subsequent to the giving of the bond and mortgage waived or barred his defence to the enforcement thereof in the hands of Isaac Bell, the assignee?

Edward Stainer, of the city of New-York, the complainant, on the 17th of February, 1840, filed his (amended) bill in the court of chancery, against Isaac Bell and James H. Bell; in which he stated, that on or about the month of June, 1836, he agreed to purchase of one James H. Bell certain real estate in the state of Ohio, who, at the time of such agreement, pretended to be the owner thereof, and afterward the said James H. Bell executed and delivered to said Stainer, for a considera-

tion therein stated, a deed of said real estate. The bill then sets out a warranty deed, dated August 1, 1836, from James H. Bell to Edward Stainer, for the consideration of six thousand dollars, conveying three lots of land in Sandusky city, Ohio. That after the execution and delivery of said deed, Stainer executed a bond and mortgage, conditioned for the payment of $4,000, as part of the consideration money, the mortgage describing the same premises.

The complainant then states, that after the execution and delivery of the bond and mortgage, he caused inquiry to be made into the title of the premises, and was informed and believed that said James H. Bell never had any legal or equitable title whatsover to said premises, except as hereinafter mentioned, but that he so pretended to be the owner thereof with the view and intent to defraud the complainant. Complainant was informed and believed that at the time of the agreement so made as aforesaid, the said James H. Bell had a contract of sale of said real estate from the owner thereof, which contract, however, was only in the nature of a conditional sale; and complainant alleged that he would not have made an agreement for the purchase of said real estate in the manner aforesaid, if he had been informed of such conditional sale. Complainant charged the fact to be, that the said James H. Bell concealed the existence of said conditional sale, with the view and intent to defraud the complainant. Complainant was informed and believed, that by the terms and conditions of said sale to Bell, the same had become forfeited, so that a conveyance of said real estate from the owner thereof could not then, in law or equity, be enforced. Complainant stated that he never had possession, nor said Bell never had possession of said premises; and believed that possession thereof remained in one or more persons who claimed the legal title thereto, and who refused to permit complainant to take possession. Complainant stated that the person or persons so holding or claiming to have the legal title to said premises adversely to complainant, had, as complainant was informed and believed, a good, valid and legal title thereto, as well as the possession and enjoyment thereof.

Bell *agt.* Stainer.

Complainant alleged that the conditional sale to James H. Bell had become forfeited and void, by reason of the non-fulfilment by said Bell of the terms and conditions thereof; and which forfeiture was incurred before complainant had any knowledge or information of the existence of said agreement. Complainant had no information, and was unable to state more particularly how, or in what manner, said sale became forfeited; and prayed a discovery thereof from said Bell.

Complainant on or about August 1, 1837, paid to Isaac Bell the sum of $240 for interest on said bond, but paid it without any knowledge that James H. Bell never had any legal title to the premises, or that he was possessed of said conditional sale only, or that the conditional sale had become forfeited. Complainant had paid no interest to Isaac Bell on said bond, or in any way acknowleded an indebtedness by virtue thereof since information that James H. Bell had no legal title to the premises at the time, nor since the conveyance was made to complainant. Complainant communicated such information to Isaac Bell as soon as he was able, by exercising due diligence after the same came to the knowledge of the complainant, and then caused notice to be given to Isaac Bell, that he did not deem himself liable equitably or legally to pay said bond or mortgage.

Complainant stated, that after the execution and delivery of the bond and mortgage, said James H. Bell executed an assignment or transfer thereof to Isaac Bell, of the city of New-York, the father of said James H. Bell. That Isaac Bell, after being informed of the fraudulent sale, refused to deliver up to complainant said bond and mortgage, but claimed to hold complainant responsible for the amount due thereon. Complainant stated that Isaac Bell took the transfer or assignment of the bond and mortgage subject to all the existing equities between complainant and James H. Bell.

Complainant called for an answer on oath, and for an injunction restraining the prosecution at law or in equity of the said bond and mortgage; and prayed for a decree that said bond and mortgage be delivered up to complainant to be cancelled.

Bell *agt.* Stainer.

On the 27th February, 1840, Isaac Bell, the appellant, answered the amended bill, and on the 20th of August, 1841, James H. Bell put in his answer under oath as required by the amended bill. Replications were filed to these answers. Before the testimony was taken, the respondent's solicitor stipulated and agreed " that the answer of said James H. Bell should be deemed to have the same legal effect as if it were the answer of the said Isaac Bell." It is only necessary, therefore, in bringing out the whole case, to allude to the answer of James H. Bell.

The answer of James H. Bell admitted that complainant did somewhere in or about the month of June, 1836, or previous thereto, agree to purchase of defendant, though not in person, but through his agent, one Andreas Antoine Melly, who was then in the city of Sandusky, Ohio, where defendant was then residing, certain real estate situate in the state of Ohio, and that the defendant afterward executed and delivered to the complainant such deed thereof, as in said bill of complaint mentioned, and for the consideration of $6,000, but denied that said deed was executed and delivered on the 1st of August 1836, but averred that said deed, though it bears date 1st day of August, 1836, was not executed or delivered until somewhere in or about the month of January

Admits that complainant did, cotemporaneously with the execution and delivery of the said deed, through Dutilh, who was at the time of the execution and delivery of the bond and mortgage in said bill mentioned, also the attorney of the said complainant, execute and deliver to the defendant such bond and mortgage for the purposes in said bill mentioned.

After stating that defendant had no knowledge or information except from the bill of complaint, of various allegations of the complainant, the answer proceeded as follows :—

And this defendant further answering, saith that he, this defendant, at and previous and subsequent to the time of the agreement by said complainant to purchase the real estate in said bill mentioned and described, resided in the city of Sandusky, state of Ohio ; that previous to the said last mentioned

agreement by the said complainant, and while this defendant was residing at Sandusky as aforesaid, this defendant contracted with J. and J. W. Hollister for the purchase of certain lots of ground in said Sandusky, and among other lots for the purchase of those in said bill mentioned as sold by this defendant to the said complainant; that the aforesaid contract so made by this defendant with the said Hollisters was in writing, and was entered into by this defendant, in the full confidence and belief, and under full and positive assurances from them, that they, the said Hollisters, could and would be able to make a full and valid title in fee simple to the aforesaid premises. That after this defendant had made the aforesaid contract with the said Hollisters, and while the same was in full force, this defendant, in the full belief and confident expectation that the said complainant would, under the contract with this defendant, and then about to be made, obtain a good and valid title in fee simple to the premises then to be purchased by him from this defendant, and in said bill more particularly mentioned, somewhere in the month of May or June, one thousand eight hundred and thirty-six, in Sandusky aforesaid, entered into the contract for the sale thereof to the said complainant, for the sum of six thousand dollars, with or through one Andreas Antoine Melly, then also in Sandusky aforesaid, as the attorney of the said complainant, and this defendant accordingly, in pursuance and in part fulfilment of said contract, received the sum of two thousand dollars, part of the consideration money for the sale of the aforesaid premises, by a draft drawn by the said Melly on the said complainant, then in the city of New-York.

And this defendant further answering, says that some four or five months afterward, this defendant went to the city of New-York and then had a conversation with the said complainant, and told him in the month of January, one thousand eight hundred and thirty-seven, that he, this defendant, could not give him any other paper than a release or quit-claim of his right and title under the said contract with the said Hollisters as aforesaid, that he, this defendant, had not then the legal title to the aforesaid premises, but only held the aforesaid contract

Bell *agt.* Stainer.

of sale, and that he would not then make a legal title. That said complainant then said that he would be satisfied with any thing that this defendant could or would choose to give him as an evidence that he had any title whatsoever in the said premises, and that as he was in a hurry and going to Europe, he had not time to attend to it, and would authorize Mr. Dutilh to give this defendant a bond and mortgage for the balance of the purchase money; that this defendant then, with this express knowledge on the part of the said complainant of the state and condition of the said title, completed the purchase with the said complainant by executing and delivering to him, somewhere in or about the month of January, one thousand eight hundred and thirty-seven, the deed of conveyance in said bill set forth, and the said complainant at the same time executed and delivered to this defendant the said bond and mortgage for four thousand dollars in said bill referred to, as and for the balance of the consideration or purchase money of the aforesaid premises, through one Eugene Dutilh, as the attorney in New-York of the said complainant.

And this defendant further answering, saith the said Melly, previous to and at the time of entering into the aforesaid contract for the purchase of the aforesaid premises by said complainant, and while he was the attorney of the said complainant in that behalf, and while acting as such attorney, was fully aware of the title of this defendant to the aforesaid premises, and that he, this defendant, had only a contract from the said Hollisters, for the sale of them to him, by the said Hollisters. That the said contract and purchase of the aforesaid premises were made by said complainant with a full knowledge on the part of his said attorney, Melly, of the circumstances herein in this behalf set forth, and the same was made under the aforesaid contract which this defendant had entered into with the said Hollisters, and with the knowledge of all the risks attending such a contract as this defendant had entered into with the said Hollisters.

And this defendant further answering, saith that he, the said Melly, had also at this time become a purchaser of similar pro-

Bell *agt.* Stainer..

perty, and had seen and was aware of the nature of the title, and he also saith that the said complainant was at the time of the execution and delivery of the said deed by this defendant, and of the said bond and mortgage to this defendant, fully and unequivocally in possession of the whole facts of the case herein above set forth, and that the only title which this defendant had to the aforesaid premises was under the aforesaid contract with the said Hollisters, and expressed himself willing to take such title as this defendant had. And this defendant further answering, says he has not the said contract in his possession, and is unable to set forth the terms thereof.

And this defendant further answering, saith he admits that the said complainant did, on or about the first day of August, one thousand eight hundred and thirty-seven, pay to the said Isaac Bell the sum of two hundred and forty dollars for interest due on the said bond, as stated in said bill, but this defendant doth deny that the said complainant paid the same without any knowledge or information that he, this defendant, never had any legal or valid title to the aforesaid property so conveyed to him by this defendant, as stated in said bill, or that he paid the same without any knowledge or information that this defendant was possessed of a contract of sale only of said property, but this defendant has no knowledge or information except from the said bill, whether or not the said complainant paid the said interest without any knowledge or information that by the terms and conditions of said sale, the same was forfeited or void, if the same had then become forfeited and void, but which this defendant in no wise admits, and therefore leaves the complainant to make such proof thereof as he may be advised to do; but this defendant doth deny, for the reasons hereinbefore set forth, that the said complainant paid no interest to the said Isaac Bell upon the said bond, or that he never acknowledged an indebtedness by virtue thereof, since the information was received by him that this defendant had no legal title to the said property so conveyed by him to the complainant, as in that behalf stated in said bill, or that he communicated such information to the said Isaac Bell as soon as the complainant

was able so to do, by exercising due diligence after the same had come to the knowledge of the said complainant, or that he, the said complainant, then caused notice to be given to the said Isaac Bell, that he said complainant did not hold himself liable to pay said bond and mortgage, as in that behalf stated in said bill, inasmuch as the said complainant knew of the said contract of sale made by this defendant with the said Hollisters at the time the aforesaid contract was made with the said complainant, either personally or through his attorney or agent, the said A. A. Melly, and had actual knowledge at the time of the execution and delivery of the said bond and mortgage, that he, this defendant, had but a contract of sale for the aforesaid premises, and no other title to the same; and the said contract of sale was entered into by said complainant somewhere in the month of May or June, one thousand eight hundred and thirty-six, the conveyance and said bond and mortgage executed and delivered somewhere in or about the month of January, one thousand eight hundred and thirty-seven, and the interest on said bond and mortgage paid by the said complainant to the said Isaac Bell, somewhere on or about the first day of August, one thousand eight hundred and thirty-seven, but whether the said complainant communicated any information to the said Isaac Bell in the premises, or whether he caused any notice to be given at all to the said Isaac Bell, as to his, the said complainant's not deeming himself liable to pay said bond and mortgage, as is in that behalf set forth in said bill, this defendant has no knowledge or information except from the said bill, and therefore leaves the complainant to make such proof thereof as he may be advised to do.

Admits the assignment of the bond and mortgage to Isaac Bell, for a present money consideration, at the same time the conveyance to complainant was executed, to wit, January 27, 1837.

It was admitted by the solicitor for the complainant as follows:—

It is hereby agreed to admit, as proved on the part of the above defendants, the following facts:—That the said James

Bell *agt.* Stainer.

H. Bell, in the year one thousand eight hundred and thirty-six, while residing in Sandusky, in the state of Ohio, entered into a written contract with J. and J. M. Hollister, for the purchase from them of the premises mentioned in the bill of complaint in this cause. That the said James H. Bell then paid on said contract and as part of the purchase money the sum of sixteen hundred and twenty dollars. That subsequently thereto, to wit, somewhere in May or June, one thousand eight hundred and thirty-six, at Sandusky aforesaid, the said James H. Bell contracted with the said complainant, through one Andreas Antoine Melly, the agent or attorney of the said complainant, for the sale to the said complainant of the premises mentioned in said bill of complaint, for the sum of six thousand dollars. That the said Melly, at the time of this contract, was in Sandusky aforesaid, and drew a draft on said complainant, then in the city of New-York, in favor of James H. Bell, for two thousand dollars, part of said last mentioned purchase money, which draft was accepted by said complainant, and the same paid by said complainant to said James H. Bell, when the same came to maturity. That at the time of the said contract by said Bell with said Hollisters and since, the legal title was and is in the original proprietors of the town, Isaac Mills and the heirs of Tulman Wildman, who contracted to sell the premises with other premises to Messrs. Camp, Nichols and others, who contracted to sell to J. and J. W. Hollister, who contracted to sell to said J. H. Bell. That in the month of January, one thousand eight hundred and thirty-seven, the said James H. Bell came to the city of New-York, and then saw the complainant, who was shortly to leave the city for Europe. That the said James H. Bell then executed to the said complainant the deed set forth in said bill of complaint, and the said complainant thereupon through Eugene Dutilh, then his attorney in New-York, executed and delivered to the said James H. Bell the bond and mortgage in said bill mentioned, and who, for the sum of three thousand and five hundred dollars, then paid to him by the said Isaac Bell, assigned the said bond and mortgage to the said Isaac Bell. That the said complainant

Bell *agt.* Stainer.

paid one year's interest on the said bond and mortgage to the said Isaac Bell, on or about the first day of August, one thousand eight hundred and thirty-seven, amounting to the sum of two hundred and forty dollars. That the said James H. Bell was able to secure, and that the said Isaac Bell could have secured from the said James H. Bell the amount of said bond, had the said Isaac Bell, previous to the intimation to him by said complainant, as stated in said answer of said Isaac Bell, been informed of any such alleged want of title in the said James H. Bell, but that the said James H. Bell, at that time, was and has since continued insolvent. It is also agreed, that the answer of the said James H. Bell be deemed to have the same legal effect as if it were the answer of the said Isaac Bell.

N. DANE ELLINGWOOD,

*March 22d,* 1843. *Sol'r for complainant.*

It is further admitted, that the bond and mortgage executed by the complainant, and referred to in the pleadings in this cause, were assigned to the defendant, Isaac Bell, on the 27th day of January, one thousand eight hundred and thirty-seven, who then paid therefor the sum of three thousand five hundred dollars in money, in good faith, and without any intimation of any equity or claim of equity on the part of the complainant Stainer, in respect to said bond and mortgage.

N. DANE ELLINGWOOD,

*March 22d,* 1843. *Sol'r.*

It was admitted by defendant's solicitor as follows:—

It is hereby agreed to be admitted on the hearing of this cause, that James H. Bell, one of the defendants in this suit, never had any deed or conveyance to him of the property contained or set forth in the deed from the said James H. Bell to Edward Stainer, the complainant in this cause, except from the said Edward Stainer, and a copy of which is set forth in the bill of complaint filed therein. That prior to the time of the execution of the deed in the said bill mentioned, and in May, one thousand eight hundred and thirty-six, the said James H. Bell had a written contract in the nature of a conditional sale

from J. and J. W. Hollister, from them to him of the aforesaid premises, in which the said James H. Bell, at the time of the execution of the said contract, paid the sum of one thousand six hundred and twenty dollars, part of the consideration or purchase money, but neglected to pay the balance of said consideration money, and that the said James H. Bell never held any other muniment of title to the said premises; that the said contract has been unperformed by the said James H. Bell by reason of the non-payment by him of the balance of said consideration money, and that the said James H. Bell never had possession of said premises under said contract, nor had any right to the possession thereof at the time of the execution of the said deed. That the bond and mortgage now held by Isaac Bell, a defendant herewith, and executed by Edward Stainer by his attorney, are the same bond and mortgage that were received by the said James H. Bell, as a security for the payment of the consideration money for the premises stated or set forth in the said deed to Edward Stainer from the said James H. Bell.

A. G. Rogers,

*Dated April* 13, 1843.                                       *Sol'r for def'ts.*

The cause was brought to a hearing before the assistant vice-chancellor of the first circuit in May, 1843. But one witness was sworn; his testimony was as follows :—

*Anthony A. Melly*, of the city of New-York, being duly sworn, says that he was in the city of Sandusky, Ohio, in the spring or early in the summer of 1836, and he there saw Mr. James H. Bell, a defendant in this suit. And deponent further says, that he then told the said Bell that Mr. Stainer, the complainant, wanted to invest some money in lots in Sandusky. Mr. Bell said either that he had some lots or would buy some lots for Mr. Stainer, and he showed deponent the lots so to be sold to the said Stainer; he also marked some lots on a map as being lots to be sold to the said Stainer. Deponent did not know whether the lots belonged to Mr. Bell or not. Deponent informed the said Bell that Mr. Stainer had authorized deponent to permit the said Bell to draw upon the said Stainer for

one-third of the purchase money, the balance thereof to be left on bond and mortgage.. And deponent says, that previous to that time, the said Bell had informed this deponent that he had purchased lots for him in Sandusky. The said Bell received on account thereof about nine thousand dollars from deponent; at the time the deponent conversed with the said Bell as afore-said, Bell said nothing about the title either to Stainer's lots or deponent's lots. Bell never said any thing to deponent as to what title the said Bell had, either to the lots so sold to Stainer or sold to deponent. The said Bell never said any thing to deponent as to any agreement which he held for the purchase of said lots, or cither of them. That Bell never said any thing to deponent about the titles. Bell said he would send the paper titles to New-York. Deponent does not recollect whether the said Bell said he would send such titles immediately or not. It was more than a year after deponent had paid the money aforesaid to Bell, and Bell had informed this deponent that he had made purchases for him of lots in Sandusky, that deponent first learned that the said Bell had no deed to the said lots so sold to deponent. Deponent says, that he dares say that it was more than a year, or at least some time, a long time after Mr. Bell had sold the lots to Mr. Stainer, that deponent first learned that Bell had never had any deed for said lots. At the time of the sale of the lots by Bell to Stainer and deponent, deponent understood that the titles thereto were those to be perfect and good as a matter of course; and deponent says, that when he asked the said Bell in the spring or summer of 1836 for his title deeds, the said Bell said that he could not give them to him then, because the register was absent, or something to that effect. In the purchase of said lots for depo-nent, the said Bell played a trick upon deponent.

This deponent, on *cross-examination*, further saith, there was no written contract between myself and Bell for the purchase of the lots for Stainer; did not understand that Bell had a contract for the sale of the lots to Stainer. Deponent never searched for the title to these lots to Stainer. That deponent will not be positive that it was a year before he first heard that

Bell had no title for the lots sold to Stainer; it was some time afterward, it was in January, 1837, or after that time, that I first heard he had no title to these lots sold to Stainer. It was after he first came to the city from Sandusky. This information I got from Stainer himself.

And on further *direct examination*, deponent further says, that in acting and negotiating with Bell as aforesaid, in regard to the lots sold to Stainer and deponent, this deponent treated the said Bell with the most unlimited confidence. It may have been by possibility much more than a year that I first heard that Bell had no title to the lots sold Stainer. Deponent says that he thinks Stainer was the first who told him about it. It was after deponent returned from Europe, in the summer of 1838, he now thinks, that he first heard that Bell had no title to the lots sold to Stainer.

On *cross-examination*, deponent says, he believes it was in January, 1837, he got from Bell the deed for the lots sold him by Bell. Yes, it must have been in January.

On the 4th September, 1843, the assistant vice-chancellor decreed that said bond and mortgage be delivered up to the respondent to be cancelled.

From this decree the appellant appealed to the chancellor, who, on the 27th May, 1846, affirmed said decree with costs.

Isaac Bell thereupon appealed to the court of errors, which appeal by due course of law was transferred to this court.

*A. G. Rogers, Attorney, and*
*Samuel Stevens, Counsel,* for appellant.

*First.* The respondent must be confined to the case made by his bill. He cannot sustain his bill by a resort *to any other ground or act of fraud* than that alleged in his bill.

*Second.* The only fraud alleged in the bill is, that James H. Bell, *at the time he agreed to sell the premises, pretended to be the owner thereof;* that he never had any legal or equitable title whatever to said premises, but *so pretended* to be the owner thereof to defraud the respondent; that he only had a contract of sale thereof from the owner, which contract was only in

the nature of a conditional sale; and that he concealed the existence of said conditional sale to defraud the respondent. (*Original bill, p.* 3, *folios* 1, 2; *p.* 5, *folios* 11, 12; *Amended bill, p.* 17, *folios* 1, 2; *pp.* 18, 19, *folios* 9, 10, 11.)

*Third.* The respondent wholly failed to make out the case of fraud alleged in his bill.

1. Fraud is not to be presumed. On the contrary, the law presumes every man to be guiltless of fraud; free from all guile. And this presumption will prevail, and protect those attempted to be charged with fraud, until it is repelled by express, clear, and unequivocal evidence of guilt; and this evidence must consist of either direct proof of fraud or proof of such circumstances as are necessarily inconsistent with the innocence of the party charged with the fraud. (*Kinlock* v. *Palmer*, 1 *Mill's S. C. Court Rep.* 224; *Fort* v. *Metayer*, 10 *Martin's Rep.* 349, 436; 8 *Peters*, 244; 12 *do.* 178.)

2. Keeping this principle in view, we humbly insist the evidence fails to show that James H. Bell pretended to be the owner of the premises at the time of the agreement to sell for the purpose of defrauding the respondent.

3. The evidence also fails to show that James H. Bell concealed the fact that the contract of sale to him was conditional, to defraud the respondent, or that he concealed it at all.

4. The answer of James H. Bell positively denies that he pretended to be the owner of the property for the purpose of defrauding respondent, or that he concealed the nature of his contract for the like purpose, or that he concealed it at all. This answer is not disproved by the evidence of Melly, the only witness sworn in the cause; and if it were, the testimony of one witness would not be sufficient. Besides, all the circumstances in the case support the answer. James H. Bell was then a man of character, property and responsibility, and expected to remain so, and could have no object in committing a fraud which could have been discovered in twenty-four hours, and which must, and he knew must, necessarily be discovered when an examination of the title should be made. He never used any persuasions to induce respondent to purchase, never

even asked him to do so, suffered the agreement to remain a mere honorary agreement, never hurried it through or evinced the least desire to get the bond and mortgage, (two-thirds of the purchase money,) delayed eight months to give the deed and receive the bond and mortgage, in order to get his title completed, and then only gave it at the *request* of the *respondent* himself. In common parlance he was the owner, although he had not the legal title for it—had paid down $1,620 toward it, and was able to pay the residue. Under such circumstances fraud could not be imputed to him for contracting to sell it as the owner. (2 *Story's Equity Jurisprudence, sec.* 1528; *Stafford* v. *Bryan,* 3 *Wend,* 532, 537, 538; 1 *Clarke's Rep.* 408.)

5. The respondent's agent knew, or had ample and easy means of knowing, the state of the title to this property. He could have examined the register's office himself. Courts of equity will not listen to an allegation of fraud from a party who might have protected himself against the alleged deception by the exercise of the least degree of common prudence. In such cases the allegation of fraud is looked upon as altogether an after thought, and the court will not relieve a party against an alleged fraud, against which he might, by the slightest exercise of his own powers, have protected himself. (*Griffith et al* v. *Kempshall and others,* 1 *Clarke's Rep.* 578; 1 *Story's Eq.* § 191; 2 *Kent's Commentaries,* 484, 485, 3d ed.)

6. But if it be admitted that James H. Bell at *the time of the agreement in May,* 1836, did actually conceal this contract of sale, still such concealment was *no* fraud, for it was, *at least so far as regards the bond and mortgage,* the concealment of an immaterial fact taking place eight months before the execution of the bond and mortgage, *during which time* the respondent must be presumed to have looked into the title, or to have been informed with regard to it. (1 *Edward's Ch. Rep.* 442; *Littel's Rep.* 275; *Dess.* 134; 1 *Bibb* 235; 3 *Vermont Rep.* 272; 3 *Wend.* 532; 2 *Story's Eq. Jur.,* § 1528, *p.* 914; *Greenly* v. *Cheevers,* 2 *East,* 4 *Johns. Rep.* 126; *Woodcock* v. *Bennett,* 1 *Cow.* 742.)

☞ Was a contract to sell and convey land at a future

Bell *agt.* Stainer.

period. Deed not given till eight months afterward; no time was fixed for performance.

*Fourth.* The accepting of the deed by the respondent with covenant of warranty, eight months after the contract of sale, and without objections to the title, merges the contract of sale and the alleged false representations and suppressions at the time of such contract, and they being merged, were at an end; hence it became necessary for the respondent to *show* misrepresentation or concealment *in January,* 1837, *when* the deed was executed and the bond and mortgage given. But not only are *no* misrepresentations or concealment at that time shown, but the respondent was then distinctly and expressly told by James H. Bell the true state of the title. If no fraud was practiced *at the time* the deed was accepted and the bond and mortgage in question given, it cannot be pretended that the latter were fraudulently obtained. See *James Bell's answer, fols.* 14, 15, 18, 19, which, being responsive to the bill, is conclusive on that point. (*Griffith, &c.,* v. *Kempshall, &c.,* 1 *Clarke's Rep.* 571; *Miller* v. *Long,* 3 *A. K. Marsh Rep.* 334; *Cradock* v. *Shirley, ibid.* 288; *Royston* v. *Scheckelford,* 5 *Littel's Rep.* 239; *Creigh* v. *Beeton,* 1 *Watts & Serg. Rep.* 83; *ibid,* 442; *Houghtaling* v. *Lewes,* 10 *Johns.* 298; *Howes* v. *Barker,* 3 *Johns.* 498; *margl. p.* 506.)

*Fifth.* The payment, by the respondent to the appellant on the 1st of August, 1837, of the interest then due on the bond and mortgage, was an acknowledgment and ratification of their validity, and should preclude the respondent from afterward disputing the same, in the hands of the appellant, who is a *bona fide* assignee paying therefor a present valuable consideration.

1. It is no answer to this position, that the respondent had not then ascertained that the title was defective. He should have ascertained it. It was fifteen months after the contract of sale, and seven months after the bond and mortagage had been given and assigned to the appellant.

2. If the respondent did not, in fact, then know that the title was defective, it was owing to his own gross negligence, and

where, by such negligence, either he or a *bona fide* assignee of the bond and mortgage is to suffer, surely the one guilty of the negligence should suffer. It is conceded that had the appellant, *at that time*, or previous to the first intimation of Bell's want of title, had notice that the respondent claimed the bond to be void, he could have secured himself for the money he had paid the assignor for the bond and mortgage. The assignor was then responsible, and so continued down to shortly before the first intimation of the respondent's alleged equity, August 23, 1838. He has since, and before the appellant had any notice that the respondent intended to question the validity of the bond, failed and become utterly insolvent. (*Goodman* v. *Eastman*, 4 *New-Hampshire Rep*. 455; *Chit. on Contracts*, 224, *note*.)

3. Certainly the respondent could not, under these circumstances, be permitted to question the validity of the bond, if he had paid the interest on it for one year to the assignee, after he knew the title to the property had failed. He therefore alleges that he did not then know it, but he has not given one particle of proof to sustain that allegation. He should be required to give full and clear proof, not only that he did not then know it, but that with due vigilance and diligence he could not have ascertained it, before equity will permit him to defeat the rights of a *bona fide* assignee.

4. But the respondent did know, at the time he paid the interest, what the state of the title was. This is expressly sworn to in the answer of James H. Bell, which is responsive to the bill, and is therefore conclusive on that question. (*Waller* v. *Quigg*, 6 *Watts*, 87; *Wigg* v. *Wigg*, 1 *Atk*. 334.)

☞ That Bell had an equitable title, see 4 *Hill*, 635; 7 *Vesey*, 274; *Champion* v. *Brown*, 6 *Johns. Ch*. 398. As to the effect of a quit-claim deed, and one with warranty, *see* 1 *Cow*. 613–711; 11 *Johns*. 91; 14 *do*. 193, *McCracken* v. *Wright*. Want of title not sufficient without fraud. *Sugden on Vendors*, 347, 348, 349, 350. ☞

☞ *S. Stevens*, in reply.—If a man sell and convey land by quit-claim deed, with no other representation than that from the act of selling, purchaser has no remedy either at law or in

Bell *agt.* Stainer.

equity in case of defect of title. (5 *Paige*, 306–7.) And if he conveys with warranty, the only remedy is on the covenant. 18 *J. R.* 560–1.

As to what must be alleged or no relief.—*Story's Eq. Pl.* § 27, 241, 251, 255.—This bill should have been dismissed on demurrer; and if so, objection may be taken now. *C. & H.* 297–8.

A. V. C. says he does not believe the answer. He had no right to say that. He was bound to believe it, until disproved by two witnesses, or evidence equivalent.—Complainant makes defendant his witness. 2 *Story Eq.* § 1528; 13 *Ves.* 119.

Complainant was bound to inquire as to validy of title. ⬥

*N. Dane Ellingwood, Attorney and Counsel* for respondent.

*First.* The bond and mortgage which the respondent seeks to have cancelled were procured by fraud.

1. James H. Bell represented himself to be the owner of certain lands deeded to the respondent, and as a part of the consideration thereof, the respondent gave the bond and mortgage in question to James H. Bell.

2. The said James H. Bell never had either the legal title, or the possession of the premises conveyed by the deed; and the only interest which he had therein was under and by virtue of a contract of sale, the existence of which he concealed from the respondent.

*Second.* The bill of complaint sufficiently sets forth the allegations of fraud, which, although denied in part by James H. Bell in his answer, are sustained by the testimony, and by the facts and circumstances of the case.

*Third.* Having so represented himself to be the owner of the land pretended to be conveyed by the deed, James H. Bell was guilty of fraud; unless it be true that at the time of the agreement to sell, he did inform Mr. Melly, the agent of the respondent, that he was not the legal owner, and held a contract of sale only for the land; or unless it be true that he, James H. Bell, did, in January, 1837, personally so inform the respondent. James H. Bell, in his answer, avers that he gave such information both to Mr. Melly and the respondent himself;

Bell *agt.* Stainer.

this averment is unsustained by any proof, and is 'manifestly untrue and disproved by the testimony of Mr. Melly and the facts and circumstances of the case.

1. Mr. Melly, the witness, denies that he was informed that James H. Bell had a contract of sale ; and to the contrary, he says that Bell pretended that he could not show witness his title deeds, because the register was absent. (*See pages* 40 *and* 41 *of the case.*)

2. The facts of the case show the falsity of this averment in James H. Bell's answer. Had it been true, the respondent would have taken an assignment of the contract, not a deed. The respondent could not have enforced the contract, or procured a title from the legal owner by means of the deed alone. (*Jackson ex dem.* v. *Demont,* 9 *J. R.* 55.)

3. Besides, it is manifest that the object of James H. Bell was to raise money upon the mortgage ; to effect this object, it was necessary for him to conceal the fact that he had a contract of sale only.

*Fourth.* Isaac Bell took an assignment of the bond and mortgage, subject to all the equities that existed between the respondent and James H. Bell. (4 *C.* 722.)

*Fifth.* Those equities were not waived or impaired by the payment of interest upon the bond after the assignment made to Isaac Bell, inasmuch as the respondent paid it in ignorance of the fraud which had been practiced upon him.

*Sixth.* The appellant has no equities as against the respondent.

☞ Pretended to be owner by the words of the deed—so false pretence at time deed was given. (3 *East,* 200 ; 9 *J. R.* 55.)

Should have assigned the contract.

JEWETT, Chief J. The object of the complainant's bill was to set aside, and procure to be cancelled, a bond and mortgage, executed by the complainant to James H. Bell, one of the defendants in the court below, and which he assigned to Isaac Bell, the appellant, on the ground of fraud. The bond and mortgage as is alleged and admitted to be true, were given to secure the payment of two third parts of the purchase price of

three lots of land in the city of Sandusky, state of Ohio, which J. H. Bell contracted with the complainant to sell him in June, 1836. The fraud, as alleged in the bill, is, that J. H. Bell, never having had any legal or equitable title to the premises, except such as he derived through·a contract for the purchase thereof of the owner, which had become forfeited, and which he concealed from the complainant, with the view and intent to defraud him at the time he made the contract with the complainant to sell him the premises, and received $2,000 toward the purchase price thereof, and with the view and intent to defraud him, *pretended to be the owner thereof.* The defendants answered under oath, as called for by the bill.

J. H. Bell, in his answer, positively denies that he ever pretended to be the owner of the premises, *with the view and intent* to defraud the complainant; or that he ever pretended to be the owner thereof, or that he concealed the existence of the alleged contract of sale, or conditional sale, as called in the bill, *with the view and intent to* defraud the complainant, or that he concealed it at all from the complainant. It appears that J. H. Bell, at the time of the contract, resided at Sandusky, and that the complainant resided in New-York : that one A. A. Melly, as the agent of the complainant, was at Sandusky, and in his behalf made the contract with J. H. Bell for the purchase of the premises, and drew upon the complainant in favor of Bell for $2,000, in part satisfaction of $6,000, agreed upon as the consideration of the purchase.

J. H. Bell further in his answer says, that Melly, previous to and at the time of making the contract, and while he was such agent and acting in that character, was fully aware of his title to said premises, and that he had only a contract from J. and J. W. Hollister for the sale of them to him ; that the contract between the complainant and him was made with a full knowledge, on the part of Melly, and that the same was made under said contract which he had entered into with said Hollisters.

This answer thus far is responsive to the bill, and, as such, evidence of the truth of the matter so set up : the inquiry then

follows, is it overcome by the testimony in the cause? The rule on this point is admitted to be, that unless it be overcome by the testimony of at least two witnesses, or by one witness and by circumstances, equal to another, the answer must prevail.

The only witness relied on to impeach the answer by his evidence is Melly. He says, in the spring or early in the summer of 1836 he met J. H. Bell at Sandusky, and then told him that Stainer wanted to invest some money in lots at Sandusky: that Bell either said that he had some lots, or would buy some lots for Stainer, and showed him the lots so to be sold to Stainer, and marked lots on the map so to be sold to him; that he did not know whether the lots belonged to Bell or not; he told Bell that Stainer had authorized him to draw on Stainer for one-third of the purchase money, the balance to be left on bond and mortgage: that Bell said nothing about the title he had, nor anything as to any agreement which he held for the purchase of said lots. He said he would send the paper titles to New-York. That he did not learn for a year or more after the sale that Bell had no deed for the lots. At the time of the sale, Melly understood, as a matter of course, that the titles thereto were to be perfect and good; that when in the spring or summer of 1836 he asked for his title deeds, Bell said that he could not then give them to him, as the register was absent, or something to that effect.

This is all of the testimony which affects this question, unless it may be that the contract for the sale of the lots was merely verbal, not reduced to writing, and that Melly drew the draft for $2,000 toward the price, and delivered it to Bell.

The fact that Bell assumed to sell the lots is not denied, although the fact that he *pretended* to be the owner thereof is professed to be. It must rest upon a distinction which is evidently intended to be taken by the answer, between the position of a person when contracting to sell and convey a piece of land without in words alleging himself to be owner, and that of one who, when making the like contract in words, announces himself to be the owner; a distinction too slender and nice, I apprehend, for any principle of law or equity to see or comprehend.

Bell *agt*. Stainer.

The acts of Bell, as detailed in the answer above, are sufficient, in my judgment, to say that he occupied the position toward the complainant of pretending to be the owner of the lots. He contracted to sell, and I entirely agree with the assistant vice-chancellor, that it was not necessary for Bell to use words to hold himself out as the owner. The answer in this respect must be understood as denying merely that Bell in words told Melly that he was the owner; and in that sense there is no conflict between it and the testimony of Melly, or the circumstances of the transaction. The answer denies that he concealed from the complainant the existence of the contract of sale which he, Bell, had for the purchase of the lots.

And he goes further, he does not say in so many words that he *told* Melly that his title rested in a contract with the Hollisters for a purchase of the premises; but he says he had only such contract, and that Melly was fully aware of his title; and also that he had only such contract; and with full knowledge on the part of Melly of these facts, the complainant, by him, entered into the contract of purchase with him, Bell. That Melly knew of the contract under which Bell claimed the premises, or that he claimed at all under a contract, and not under a deed, is fully contradicted by the testimony of Melly. But I do not see in this case any circumstances to corroborate Melly's testimony in that particular, beyond what may be inferred from the ordinary conduct of most men, attentive to their own interests, and security in dealing, in any other year than 1836, would have been the conduct of the complainant, or of Melly his agent, if he did know upon what baseless foundation Bell's title rested, which I do not think can be allowed at any time, as circumstantial evidence to overthrow the positive evidence of an answer under oath responsive to a bill: and more especially in favor of a party confessedly entering into a mere verbal contract with a man residing in a distant place, for the purchase of lands there situated, upon so large a consideration as $6,000; and advancing one-third of the sum at the time, without making the slightest examination as to the title, or, so

far as it appears, without any definite time fixed by the contract for its consummation.

Therefore, in my opinion, unless we say that the evidence in the case shows that Melly, at and before the time he entered into the contract with Bell, had knowledge that Bell had no other title to the lands in question than such as the contract with the Hollisters passed to him, and upon that ground, and no other, Bell assumed to be the owner, we should fail to give the answer the force and effect to which it is entitled by well settled principles. If I am right in this conclusion, the case shows that Bell was not guilty of any fraudulent conceal-ment, that his title rested upon the contract with the Hollisters, or any fraud in holding out to Melly that he was then the owner of the premises. But this is not all. Up to January, 1837, the parties were under no legal or equitable obligation with each other to perform the contract. Bell was liable to refund the $2,000 on demand. What took place at that time we have not only the answer of Bell, but it is admitted by the stipula-tion of the solicitor for the complainant, so far that in that month Bell came to New-York, then saw the complainant, who was shortly to leave the city for Europe; that Bell then executed to the complainant the deed set forth in the bill, (which bears date the 1st of August, 1836;) that the complain-ant thereupon, by his attorney, Dutilh, executed and delivered to Bell the bond and mortgage in question, and who thereupon assigned the same to Isaac Bell for the consideration of $3,500, then paid to him by the latter.

The answer goes further; it alleges that he, J. H. Bell, at that time told the complainant that he could not give him any other paper than a release, or quit-claim, of his right and title under the contract with the Hollisters; that he had not then the legal title to the premises, and only held said contract of sale; and that he would not then make a legal title. That the complainant said he would be satisfied with any thing that Bell could or would choose to give him, as an evidence that he had any title whatsoever in the premises; and that as he was in a hurry and going to Europe, he had not time to attend to it,

and would authorize Mr. Dutilh to give Bell a bond and mortgage for the balance of the purchase money; that Bell then completed the purchase with the complainant by executing and delivering to him the deed, and received the bond and mortgage executed by the complainant by his said attorney, to secure the payment of $4,000, the balance of the purchase money. It is said that this statement is not credible; but it is responsive to the bill, and entitled to be credited as true, unless there is competent evidence in the case to show it false. What evidence of that character is there in the case? There is not the evidence of any witness on the subject, substantially; all the facts in that respect stated in the answer, except that which relates to the conversation alleged to have taken place in relation to Bell's title, and his ability to convey a valid title, is admitted. It is said that the giving of a deed by Bell, with a covenant of warranty for quiet enjoyment, is a declaration that he was the owner in fee simple absolute. I do not see that why may it not as well be taken as showing that the complainant reposed full confidence in Bell's ability, at some future day, to complete his title to the land under his contract with the Hollisters, and a reliance upon his integrity, as well as pecuniary interest, so to do, by which the title would enure to his benefit, and thereby save any breach of his covenant which might otherwise thereafter occur; and if he failed thus to complete his title, he could safely fall back upon the covenant of warranty, and obtain ample redress; and that Bell, fully believing that he could and should thereafter complete his title, did not hesitate to give such deed. But again, it is said, if Bell had given the complainant such information in regard to his interest as stated in the answer, and intended honestly to transfer to him such right as he had, he would have executed an assignment of the contract which he held for the lots, leaving the complainant to fulfil the unpaid purchase money on the Hollisters, and taken his personal obligation for the residue of the $4,000.

I am not able to see a foundation for such inference strong enough to impugn the truth of this answer. So far as the case

35

shows the facts, admitting the answer in this respect to be true, and conceding to Bell an honest intention to convey to the complainant what interest he had in the premises, I do not think it at all clear that men of ordinary sagacity would have transacted that business in the manner suggested.

It does not appear how much was due upon the contract to the Hollisters, whether more or less than $4,000 ; nor certainly but that the contract was forfeited, and the Hollisters absolved from its performance. It does appear that there had been a breach of it on the part of Bell—he had not paid according to its terms. Stainer, as I infer from the fact of his paying subsequently one year's interest, and that the $4,000, by the contract was to be kept on bond and mortgage, was to have some time thereafter to pay. He was on the eve of going a journey to Europe. Now under these circumstances, living at the distance he did from the premises, probably a stranger to the Hollisters, having confidence in the pecuniary responsibility as well as the honesty of purpose of Bell, is it not quite as probable that he would prefer to take the deed, and give the bond and mortgage, than to take an assignment of the contract, and take upon himself the trouble, responsibility, and risk of obtaining a title through it. He might well have supposed that Bell, by his covenant in the deed, would feel a desire to obtain a title to save it; and that being a neighbor to, and acquaintance of the Hollisters, would, in case of a technical forfeiture of the contract, be more likely to obtain the title under it than he would, situated as he was.

Other considerations have been suggested in regard to the transaction of giving the deed, from which references have been drawn to impeach the answer in that particular, which seems to me to be too light to be indulged for such purpose. It seems to me, therefore, that the case fails to show that J. H. Bell was guilty of the fraud charged in the bill, either in making the contract or in its consummation, by giving the deed and taking the bond and mortgage ; and that it is unnecessary to consider whether the complainant, by any act of his, subsequently waived

or barred his defence to the bond and mortgage in the hands of Isaac Bell.

I am of opinion that the decree of the court of chancery, and that of the assistant vice-chancellor, should be reversed, and that the bill should be dismissed with costs of the court of chancery.

DECISION—Decree of the court of chancery, as also that of the assistant vice-chancellor, reversed, and bill dismissed with costs in the court of chancery—*unanimously*.

NOTE.—JEWETT, C. J.    *Held*, that the case failed to show that James H. Bell was guilty of the fraud charged in the bill, either in making the contract or in its consummation by giving the deed and taking the bond and mortgage; and that it was unnecessary to consider whether the complainant, by any act of his subsequently, waived or barred his defence to the bond and mortgage in the hands of Isaac Bell.

*Not reported.*